IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

DEANDRE CHERRY
    Petitioner

v.

UNITED STATES OF AMERICA
    RESPONDENT

)
)
)
)
)
)
)
)

AUG 12 2020

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT
CIVIL CASE NO: 1:12-Cr-00415

HONOrable Ronald A. GUZMAN

1:20-cv-04752
Judge Ronald A. Guzman
Magistrate Judge Sheila M. Finnegan

MOTION UNDER 28 U.S.C. § 2255
TO VACATE, SET ASIDE, OR CORRECT AN
ILLEGAL SENTENCE OR CONVICTION BY
A PERSON IN FEDERAL CUSTODY

Now comes the Petitioner, DeAndre Cherry, pro-se, and herein files this motion to vacate, correct or set aside sentence pursuant to 28 USC § 2255. Petitioner is a non-lawyer, pro-se, incarcerated litigant. As such, Petitioner ask this court to follow the direction of the United States Supreme Court in HAINES v. KERNER, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed 2d 652 (1972). There, the Court stated that courts should hold pro-se pleadings "to a less stringent standards than formal pleadings drafted by lawyers". Petitioner also request that this court adopt the ruling of the Second Circuit Court of Appeals in Triestman v. Fed. Bureau of Prisons, 470 F.3d 471 (2nd Cir. 2006) (per curim) (requiring courts to liberally construe a pro-se party's pleading "to raise the strongest argument it suggest".

## BACKGROUND

On June 29, 2016, Petitioner, DeAndre Cherry, after a jury trial, was convicted of possession with intent to distribute a controlled substance in violation of 21 U.S.C § 841 (a)(1), 21 U.S.C § 841 (b)(1)(B), and 21 U.S.C § 851 (a)

At sentencing on September 13, 2017, The Prosecutor withdrew the enhance drug amount of 13 kilograms of cocaine, requested a career offender guideline range, which the advisory sentencing placed the Petitioner at offense level 37, with a Criminal History Category VI, resulting in a guide line range of 360 to Life. The government proposed that the Court sentence the Petitioner to a below guideline range of 240 months.

Petitioner appealed from the above convictions to the United States Court of Appeals for the Seventh Circuit. The Appeal was docketed as 17-3018. The following grounds were raised:

1. The District Court erred in refusing to suppress evidence obtained during a warrantless and non censenual search of Mr. Cherry vehicle following an arrest not supported by Probable Cause.

2. The District Court erred in failing to find a Brady violation following the government's failure to preserve and disclose photographic metadata relevant to Mr. Cherry suppression motion.

The Court of Appeals denied the Appeal on April 08, 2019 Attorney Beau B. Brindley abandoned the Petitioner upon notification of the Court denial. Petitioner without the assistance of Counsel filed a timely Petition for Writ of Certiorari to the United States Supreme Court on July 08, 2019 The Supreme Court denied the petition on October 07, 2019

## JURISDICTION

The District Court for the Northern District of Illinois, Eastern Division has jurisdiction over this case pursuant to 28 U.S.C § 2255

## ISSUES PRESENTED

1. Counsel was ineffective for failing to thoroughly investigate the details of Mr. Cherry Arrest, preserve, and obtain crucial evidence which was available at the time, which would have exonerate Petitioner. The Court violated Mr. Cherry Fifth Amendment Constitutional Right - Due Process of law-denying Petitioner the equal Protection of the law, it is the wholesale disregard, misapplication, and failure to recognize controlling precedent.

2. The Petitioners Fifth Amendment Constitutional Right "Due Process" was violated by the courts when the record was manipulated in order to assist the government in denying Mr. Cherrys substantial Constitutional Rights.

3. Counsel was ineffective for failure to have a trial strategy and intentionally failing to challenge the

the techniques of the officer's in regard to the informant and recording devices. Petitioner issue is that jury instruction #13 was wrongfully withdrawn.

4. Counsel(s) was ineffective for failing to challange erroneous Career Offender status, And the Title 21, United States Code Section 851, the case that the government relies upon does not apply for enhancement purpose's

5. Counsel(s) was ineffective for failing to insure Petitioner Constitutional Right to a Fair trial, when government violated Petitioner's Fifth Amendment constitutional right - Due Process of Law - when testimony was presented that the government knew to be deliberately False.

6. Counsel(s) was Ineffective for failing to effectively pursue, and secure the most vital right to cross-examine the Petitioner accuser. Roviaro, and Crawford v. Washington - Confrontation Clause violation

7. Trial Judge improperly interjected himself, assumed Role of Prosecutor. Affidavit - stating that the contents of this Petition is true under the penalty of perjury

Exhibit A - An Affidavit of Truth, challenging the government misrepresentation of the facts under the penalty of perjury

Exhibit B - A quick reference to the inconsistent testimony of the officer's, proof that fabricated evidence was presented.

Suppression Counsel was Constitutionally Ineffective For Failing To Follow Petitioner's Express Instructions to Subpoena and/or Requests the Court to Order Ofc. Castaneda's Camera For inspection Of The Metadata, which would Have Irrefutably, Prove That the "FIRST PICTURE TAKEN WAS OF The Satchel Being Closed", leaving The Plain View theory - Fabricated Evidence.

Petitioner would like to Apprise the Court that the instant contention/argument is a three-part argument.

In Order For Petitioner to prove his meritorious Fourth Amendment claim, First, he must prove that Suppression hearing counsel (BEAU B. Brindley) was ineffective For Failing to timely issue a Subpoena For the Metadata of Ofc. Castaneda's camera, and the Fact that, contrary to CPD Policy, Ofc. Castaneda used his "personal camera" which is not CPD property and violate the chain of custody. Second, the Petitioner must show that his Fourth Amendment was meritorious, SEE, U.S v. OWEN, 882 F.2d 1493, 1498 n.5 (10th Cir. 1989) and but For the Errors of the Suppression Attorney's Errors, the result of the

1. DeFense did not learn that Castaneda used his personal camera which is "material exculpatory evidence" until New defense Counsel requested the inspection of the Metadata. The government/Castaneda withheld this information during the Suppression Hearing.

1.

the Suppression Hearing would have been different.

(A) Suppression Hearing Counsel was Constitutionally Ineffective and was Under a Conflict of Interest as Being Federally Indicted

(B) Trial Counsel was under a Conflict of Interest as Being a person of Interest into a Federal Investigation, and was Constitutionally Ineffective for Failing, in light of Ofc. Gamboa's trial testimony; testimony that would have subverted the testimony of Agent O'Reilly, Crawford, and Agent Brazao [2.] as to Petitioner's SUV door being opened (plainview), to move the Court in accord with U.S. v. Ozuna, 561 F. 3d 728 (7th Cir. 2008), to reopen the Suppression Hearing. In light of Ofc. Gamboa's trial testimony, suppression Hearing Counsel should have expeditiously moved to inspect Ofc. Castaneda's "personal camera", asked the government to preserve the camera for the metadata, which would have undoubtedly shown and prove, as the Petitioner testified to, that the satchel was CLOSED. This would have shown that the "First picture taken" was of the Satchel being closed, as common-sense demands. Suppression Hearing Counsel And Trial Counsel, who should know the law, in accord with U.S. v. OZUNA, 561 F. 3d 728 (7th Cir. 2008) (district court can reopen Suppression hearing when the proffered evidence

2. U.S. v. cherry, 920 F. 3d at 1139 (7th Cir. 2019) (Q. Okay. So you don't think it was opened? A. No.)

would not only up-end the government case as to "Fruit of the poisonous tree, Wong Sun, supra, but also it would have clearly underminded O'Reilly, Crawford, and Brazao's Suppression Hearing testimony. To hold otherwise would belie logic!

Ofc. Castaneda's unconstitutional and nefarious actions was "done in bad faith" because, in light of the above, there is no doubt that he had a conscious effort to suppress the Metadata exculpatory evidence because it would have undermine the officer's Suppression hearing testimony, testimony to establish "plainview" of the Satchel, a Satchel that was definitely closed (under the penalty of perjury, it was closed, 28 U.S.C. § 1746), coupled with Ofc. Gamboa's trial testimony that the door of Petitioner's SUV was "closed", 920 F.3d at 1189 (Q. Okay, so you don't think it was open? A. No). there should be little doubt that Ofc. Castaneda's subjective knowledge that the Camera and Metadata had exculpatory value at the time he sold it at a garage sale, U.S. v. Bell, 819 F.3d 310, 318 (7th Cir. 2016), once again and to belabor this acute point, a claim that makes no sense at all. To hold otherwise would belie logic.

Your Honor, the Court is a highly learned and experienced jurist. That being said, what other reason (rational and/or logical) would or could Ofc. Castaneda basis be for selling his "personal camera" at a garage sale? The resounding answer should be "the bad faith basis" argued above. Bell, 819 F.3d at 318. To hold otherwise would not only belie logic, but also would deny Petitioner Due Process and Equal Protection under the law

-4-

calls the credibility of a witness into question) Counsel(s) should have moved this Court to reopen the Suppression hearing.

Your Honor, in the interest of justice and in accord with due process, the Court should take judicial notice of the following telling and material facts: (i) Why was Ofc. Castaneda, contrary to CPD policy and the chain of custody, using his personal camera?, (II) Why would Ofc. Castaneda sell his camera, a camera, in light of all the facts and circumstances of the instant case, that the government case is hinged on because of the "poisonous tree doctrine" in Wong Sun v. United States 371 U.S. 471, 488-89 (1963), a few months after the Suppression hearing, at an unknown garage sale? Even though Suppression hearing Counsel(s) were Constitutionally Ineffective, Strickland, 466 U.S. at 687-88, 694 as argued above, the Court, in good-conscious, cannot disagree that the only reason Ofc. Castaneda subsequently sold his personal camera, a camera that was "material as to the Brady and Fourth Amendment meritorious claims", at a garage sale, a claim that makes no sense at all; is because he knew that the metadata evidence, namely in light of Suppression hearing Counsel came close to asking for it (U.S. v. Cherry, 920 F.3d at 1141 (7th Cir. 2019) (During the Suppression hearing, the defense counsel asked Castaneda about the order of the photographs, but never sought to inspect the camera or it's Metadata until almost two years after that hearing.).

3. See [docket entry 60, at pg. 5 of 9]

-3-

Fifth Amendment [docket entry 60, at pg. 5]

If the First picture Ofc. Castaneda took was of the Satchel being opened, he would have remembered that. However, since the First picture tooken was indeed of the Satchel being closed, he Falsely claimed that he did not know which picture he took First. [docket entry 60].

(C) The Inevitable Discovery Doctrine is NOT Applicable To The Facts And Circumstances Of The Instant Case.

This Court ruled alternatively as to plainview of the drugs in the Satchel, A ruling, in light of Ofc. Gamboa's trial testimony And the Metadata which would have revealed that the "First picture" taken was of the Satchel being closed And on the Floor in Front of the passenger seat as Petitioner testified vociferously to, that constitutes A manifest error of law And Fact; that the drugs were Admissible under the inevitable discovery doctrine. Nix v. Williams, 467 U.S. 431, 444 (1984)

The Petitioner's SUV was legally parked on "private property" And not on the Street, impeding traffic, in A NO parking Zone, or violating Any State traffic laws or City ordinances. Thus, the law enforcement officers had no right or responsibility to tow or For Crawford to drive Petitioner's Mercedes SUV to the Markham police Station. Thus, the inventory search was NOT required or NECESSARY. Cherry 920 F.3d at 1140.

-5-

The officers can not fall back on the Community Care Taker Function to justify towing/moving Petitioner's SUV, and thus an inventory search would be conducted, which would have discovered the drugs.

It must be duly noted that the Court misinterpreted Ofc. Crawford testimony at Tr. 66, the Court states:

"Crawford further testified that he drove Defendant's car to the Markham police station because it was the intention of the officers to seize the car for forfeiture proceedings."

The actual testimony of Crawford at Tr. 66, 18-19 is the opposite of the Court's and goes as follows:

18. A. It was determined by the case agents that <u>we were not</u>
19. going to seize the vehicle, and we didn't want to leave it.

It was this decision which should inform an impartial fact finder that Law Enforcement officer knew that did not have the legal authorization to forfeit the Petitioner's vehicle, they did not have the legal authority to conduct an inventory search, search the vehicle, or arrest Petitioner. Law Enforcement was trying to discard their illegal actions by abandoning their obligations and Department procedures. No forfeiture — then officer's don't have to explain their illegal actions for forfeiting Petitioner vehicle, No confiscation of the Satchel and the Satchel do not become apart of the evidence — to show the impossibility of the Satchel being prop-open, Counselor(s) was ineffective for failing to produce the Satchel at the Suppression hearing and trial, so that the judge and jury

↓6—

could see and determine the impossibility of the Satchel being prop-open as the government photos depicts.[4]

Your Honor, as stated in Footnote 3, to try to circumvent the Fact that Petitioner's SUV was parked on a private property parking lot and thus the Community Care Taker Function does not apply to tow the SUV, and therefore would preclude an inventory search and the inevitable discovery doctrine; OFC. Crawford testified that he drove the SUV to the Markham police station For SAFEKEEPING (summarizing) Crawford actually drove the SUV to Markham Courthouse Parking lot – A huge difference. However, he just move the SUV From one private property parking lot, to a government parking lot, which both parking lots are accessible to the public. There was no ForFeiture proceed-ing. As a matter of Fact, on June 1, 2012, the very next day of the incident in question, OFC. Gamboa Along with Agent Walsh gave Petitioner's Attorney "Susan Shatz" the Keys to the SUV and the Satchel and indicated that the vehicle was parked at the Courthouse in Markham IL, The above is not mere speculation, it verifies that OFC. Crawford illegally moved Petitioner's SUV, an SUV that was legally

4. See Photo of Satchel with drugs and money protruding From Satchel, notice the picture of the Satchel is not in it's entirety, A corner of the Satchel is not visible, as if someone is holding the messenger style Satchel open. This proves OFFicer's manipulating the crime scene / photos.

parked on a private property parking lot

Suppression hearing Counsel was
Constitutionally Ineffective And was
Under a conflict of Interest as Being
Federally Indicted/Investigated During
The Suppression hearing.

The Petitioner aver that suppression Hearing Counsel was
Constitutionally Ineffective Under <u>Strickland v. Washington</u>, 466
U.S. At 687-88, 694 (1984), for Failing, As the Court of Appeals
stated in <u>U.S. v. Cherry</u>, 920 F.3d 1126, 1141 (7th Cir. 2019), to:
(1) request to inspect the camera, (2) request the government to
preserve the camera, (3) requesting a subpoena <u>Duces Tecum</u>
of the camera for the "material metadata" evidence, (4) object to
OFc. Castaneda using his "personal camera", in violation of
Chicago Police Department Policy and in violation of the chain-of-
custody doctrine and requirement, (5) Ask OFc. Castaneda or
the government to preserve the data of the camera And why was
he using his personal Camera instead of a CPD camera that would be
readily Accessible From the Property Room or the chain-of-custody
Sign-in And sign-out sheet; And (6) Issue a subpoena For
OFc. Gamboa, whose testimony would have undermined the
testimony of Agents, O'Reilly, Crawford, and Brazao whose
testimonies were clearly inconsistent, <u>Cherry</u>, 920 F.3d at 1138,
As to plainview. Q. Oh, so the door - he hadn't been Able to - he

-8-

wasn't successful in opening the door? A. He didn't get in. If he did open it, I wasn't paying attention. I was just trying to make sure he didn't get in. Q. So you don't recall whether it was open or closed? A. <u>It wasn't open</u> - he didn't get in. Let's put it that way. He couldn't get his foot in, <u>so it wasn't</u>. Q. Okay. So you don't think it was open? A. No. Id at 1139.

During the suppression hearing, the defense counsel asked Castaneda about the order of the photographs but never sought to inspect the camera or it's metadata until almost two years after that hearing. <u>Cherry's</u> counsel was well aware of the existence of this data, but at no point before or doing the suppression hearing did <u>Cherry</u> ask for the camera or the metadata, nor did Cherry ask the government to preserve the data. Id at 1141.

Lastly and more importantly, not only did Petitioner expressly instruct Mr. Beau B. Brindley to do the above (1 thru 6), but also Petitioner literally begged Suppression Hearing Counsel to subpoena the surveillance from the Boost Mobile Store, the Barber Shop, and Chinese restaurant; all surveillance of the passenger side, and the Velasquez Mufflers shop which surveillance would show the driver's side of the Petitioner's SUV. This surveillance contrary to the inconsistent testimonies of O'Reilly, Crawford, and Brazad, <u>Cherry</u>, 920 F.3d at 1138, would have verified OFC. Gamboa; trial testimony that the door of the SUV was <u>not open</u>, <u>Cherry</u>, 920 F.3d at 1139;

—9—

5.

would have clearly shown who opened the driver door, and passenger door of Petitioner's SUV, and who it was that picked the satchel up off of the floor, opened it and sat it on the passenger seat for the purpose of purporting it was in plain view when they looked inside the SUV to make sure no one was in it. Cherry, 920 F.3d at 1138-39. And surveillance footage would have verified Petitioner's version of the events. Cherry, 920 F.3d at 1138.

Counsel, in accord with Supreme Court precedent and Seventh Circuit precedent, was obligated to thoroughly investigate Petitioner case, namely when the probe would extricate Petitioner and verify the gross misconduct of the officer's (O'Reilly, Brazao, Crawford, and Castaneda). Wiggins v. Smith 539 U.S. 510, 522-23 (2003); Davis v. Lambert, 388 F.3d 1052, 1064 (7th Cir. 2004); Hampton v. Leibach, 347 F.3d 219, 253 (7th Cir. 2003) (deficient performance for failing to investigate).

## Conflict of Interest

The Petitioner learned after the Suppression hearing had

5. Ofc. Gamboa was the arresting officer.

6. Beau B. Brindley, who was Petitioner's Suppression Hearing Counsel, is suppose to know the laws applicable to Petitioner defense, namely as to procuring the surveillance from the Boost Mobile store, Barber shop, Chinese restaurant, and Velasquez Mufflers shop, also the six (6) things above that Petitioner instructed counsel to do, to no avail. See Juliani v. Bartley, 495 F.3d 487, 497 (7th Cir. 2007) ("All lawyers that represent criminal defendants are expected to know the laws applicable to their client's defense").

-10-

concluded that his lawyer Beau Brindley was Federally indicted. IF Petitioner would have known that Mr. Brindley was under a Federal indictment, he would not have hired Mr. Brindley. Perhaps this is the reason Counsel Failed to ask For the evidence above and that which the Court of Appeals stated. Cherry, 920 F. 3d at 1141.

"A deFendant who alleges a Failure to investigate on the part of his or her counsel must alleged with specificity what the investigation would have revealed and how it would have altered the outcome of the case".

Mr. Brindley Failure to Follow Petitioner's express instructions to: (1) Subpoena OFc. Gamboa to the Suppression hearing, (2) investigate the metadata of OFc. Castaneda's "personal camera", (3) procure and/or subpoena the surveillance Footage From the Boost Mobile, Barber shop, Chinese restaurant, and Velasquez MuFFlers; and (4) request the government to preserve the camera in question. For the reasons stated Supra, if Counsel would have Followed Petitioner's instructions the outcome of the Suppression Hearing would have resulted in the drugs and Petitioner's statements inadmissible. Wong Sun, Strickland, 466 U.S. at 694; Kimmelman, 477 U.S. at 382-83 (1986).

The Petitioner is Fully cognizant that the government will assert that because some of the above issue were raised on Appeal, they cannot be raised in a § 2255 motion. The above claims are Filed under the umbrella of IneFFective Assistance of Counsel, and can be raised in the instant § 2255 motion because it is analytically

-11-

distinct. See, White v. Mitchell (6th Cir.)

Petitioner's sentence was imposed in violation of the 4th, 5th, and 14th Amendment of the United States Constitution. The heroin and statements obtained as fruits of Mr. Cherry's arrest were inadmissible and allowing their admission violated the Federal narcotic laws, therefore, leaving the Court without jurisdiction to impose such a sentence. The court's misapplication of law, and failure to recognize controlling precedents, renders a miscarriage of justice.

In the case of United States v. Cherry, the government misled the Court by applying (24) twenty-four unrelated authorities. Each case cited by the government involved scenarios where law enforcement corroborated the informant's allegations that the person suspected was indeed engaging in criminal activity. The courts in those cases noted that it was this type of corroboration that gave law enforcement the probable cause to arrest the individual.

In Cherry's case, the officers lacked the necessary information to effectuate an arrest. The informant gave scant information about someone he only knew as "Mo", and from Agent Brazao's affidavit, he writes

-12-

under oath that, "the cooperating source related that he was instructed to deliver thirteen Kilograms of cocaine to cherry". (see Criminal complaint pg. 4 or 6). This information isn't only scant, but it's not even First-hand Knowledge, it's information coming from someone else, whose identity is unknown to the record. At the time of Mr. Cherry arrest, agents only knew that: 1. there was a newly arrested individual, on Federal Supervised release. This individual didn't have the permission from the Courts to act as an informer or to assist law enforcement. Agents disregarded policies, procedures and a court binding agreement and proceeded to allow this individual to cooperate and infringe upon an unknown citizen's constitutional right. 2. This individual (informant) told agents that "Mo" allegedly drove a white, SUV type Mercedes. 3. Someone was willing to meet with the informant. Any/All othe information provided by the informant was never corroborated by law enforcement. (See Supp. Tr. pg. 21, 15-18).

15. Q. Now before the arrest, you did not corroborate with him
16. exactly where the residence was? You didn't take him out
17. there, did you?
18. A. No.

Supp. Tr. pg. 24, 2-25
2. Q. Okay. Now, during the calls you never heard either

−13−

3. person, the informant or Mr. Cherry, mention a single code

4. word that could be connected with drugs, did you?

5. A. No.

6. Q. During these calls you never heard either Mr. Cherry or

7. the informant mention any code word that could be associated

8. with money, cash, did you?

9. A. No.

10. Q. You didn't hear them discuss anything about a price, did

11. you?

12. A. No.

13. Q. You didn't hear them discuss anything about a quantity

14. did you?

15. A. No.

16. Q. All that you could hear them talking about was a location

17. and when they were going to be there right?

18. A. Correct

19. Q. Okay. So there was nothing in the calls that corroborated

20. for you that Mr. Cherry was actually coming there in an

21. attempt to get drugs? All the calls told you, that they were

22. going to meet, right?

23. A. Yes

24. Q. Okay, during the calls that he made, they did not even

25. corroborate where the original place they were supposed to

Cont., Supp Tr. Pg 25, 1-8

1. meet at the beginning was, did they?

2. A. No.

3. Q. You were not able to corroborate the informant -- any—

4. let me rephrase that question.

5. You didn't obtain any evidence demonstrating that

-14-

$set\ #1$
$18\cdot 4/7$

6. this person named Mo had ever gotten drugs from this informant

7. before, did you?

8. A. No.

Supp Tr pg 27, 22-25

22. Q. All right. Now, before you did that, before you put the

23. sham cocaine in the informant's vehicle, you didn't

24. corroborate that he was ever actually going to meet anybody at

25. 147th and Loomis, did you?

Cont., Supp Tr. Pg 28, 1-21

1. A. With the phone calls? No.

2. Q. Okay, with anything other than just what he told you

3. right?

4. A. Just from the cooperating defendant's information.

5. Q. Just what he told you, right?

6. A. Correct

7. Q. Okay. And at the time you put the sham cocaine in the

8. trap compartment, you had not corroborated the informant's

9. claim that Mo actually intended to do any drug transaction

10. with him that day, did you?

11. A. Not by phone calls. No.

12. Q. Not by anything other than what he told you, right?

13. A. Correct.

14. Q. Okay now, the informant eventually went out to the Boost

15. Mobile store, the location you were talking about where this

16. was supposed to happen, right?

17. A. Yes.

18. Q. And at that time, all you knew was that the person he

19. described as Mo had said he was willing to meet him at this

20. location? That's all you knew from the calls, right?

Sd#1
p8 5/7

21. A. Correct

Supp. Tr. pg. 30, 1-12

1. Q. Okay. Now, at that point in time, when he got into the
2. car, you had never heard Mr. Cherry make any comment about
3. drugs or money at all, had you?
4. A. No.
5. Q. Never heard any discussion between them about a
6. negotiation or a price of any sort, right?
7. A. I couldn't hear anything.
8. Q. And, in fact, at the time that Mr. Cherry got into the
9. vehicle with the informant, the only thing that you had
10. confirmed was that he was driving this white Mercedes and he
11. was willing to meet the guy, right?
12. A. Correct.

This court is a Fact Finder court and a court that base it's opinions on facts included in the records and not those alleged by the government or petitioner. The evidence depicts very distinctively that law enforcement violated Mr. Cherry's Fourth Amendment Constitutional Right when arresting him. The record is devoid of any information, at any stage of the proceedings from the time the informant was arrested, until Mr. Cherry's arrest, that Mr. Cherry was engaging in, was about to engage in, or even previously engaged in any criminal activity. This supports the questioning of either the informant's reliability or the informant's allegations, alleging that Mr. Cherry was

connected to any drug transaction and/or criminal activity. Police are not allowed to infringe upon someone's liberty nor pursue an arrest because someone points the finger. See United States v. Angelo Ingrao, 897 F.2d 860; 1990 U.S. App. LEXIS 2970 No. 89-2117 (1990). See Also, United States v. Harold Delonte Castle, 825 F.3d 625; 2016 U.S. App LEXIS 10713 No. 14-3073 (2016). No urgent circumstances excused the officers from abandoning the Fourt Amendment warrant requirements. Law Enforcement did not have legal authorization to arrest Mr. Cherry, Law enforcement did not have the legal authority to search Mr. Cherry vehicle, conduct a protective sweep or view anything, plain view or not, inside of his vehicle. To apply the inevitable doctrine is incorrect and goes against the Constitutional protection guaranteed to all citizens, including Mr. Cherry.

The Fruits of such illegal conduct - as a matter of law - must be suppressed and considered inadmissible. See Won Sun v. United States (1963) 371 U.S. 471, 9 L.Ed. 2d 441, 83 S.Ct 407, See also, United States v. Cortez, 449 U.S. 411, 417-418, 66 L.Ed. 2d 621, 101 S.Ct 690 (1981) These controlling precedents requires this court to reverse the conviction and grant Mr. Cherry's suppression motion. If the court were to decide otherwise, the miscarriage of Justice will continue and the guaranteed protection of Mr. Cherry's Constitutional Rights will be nonexistent and his established rights will continue to be violated.

-17-

A 2255 is intended to readdress, "Fundamental defect[s], which inherently [result] in a complete miscarriage of justice," and "omission[s] inconsistent with the rudimentary demands of fair procedure." Hill v. United States, 368 U.S. 424, 428, (1962)

Counsel(s) was Constitutionally Ineffective
For Failing to Correct the Court on it's interpretation
of the Record - ERRONEOUS interpretation.
Counsel had an legal obligation to insure the Petitioner's
Right to a Fair and accurate determination of the
Record, And when the Court Failed it's judicial
obligation of impartiality, Counsel should have
Filed a 52(b) "plain error", pointing out specifically
where the Court erred, that the error was plain
(or obvious), that it affects Petitioner Substantial
rights, and that the error seriously affects the
integrity of the justice system.

Petitioner's due process was violated by the courts when
the record was manipulated in order to assist with the
government's denial of Mr. Cherry's constitutional rights.

Judge Guzman's memorandum, "Opinion and Order #60",
Filed on April 11, 2013 states, "The cooperating defendant had the
cell phone number of the party to whom he was to deliver the
cocaine and on the agent's instructions, the cooperating
defendant called Mo and changed the meeting place to a parking
lot at the 159th street and Kedzie in Markham in front of a
Boost Mobile store at 8:00 pm." See suppression hearing transcript
(Supp.Tr.) pg. 24 19-25:

1. Beau B. Brindley and Andrea E. Gambino is Counsel(s) that
Petitioner refers to.

19. Q. Okay. So there was nothing in the calls that corroborated
20. for you that Mr. Cherry was actually coming there in an
21. attempt to get drugs? All the calls told you, that they were
22. going to meet, right?
23. A. yes.
24. Q. Okay. During the calls that he made, they did not even
25. corroborate where the original place they were supposed to
continue (cont.) Supp. Tr. pg. 25, 1-2
1. meet at the beginning was, did they?
2. A. No

The Court memorandum, "Opinion and Order (8)", is fabricated
evidence, not only considered but manufactured by the Court.
Statements such as, "changed the meeting place," were used when
in fact, records reflected no such information. The record also
states, "Law Enforcement never confirmed that there was ever a
meeting." The verbiage of this statement can leave one with the
perception that officers at the time of the occurrence had reliable

2. Supp. Tr. pg 27 10-18, reads, 10. In your report did you mention that
any calls. 11. were made to this AL? 12. A. No. 13. Q. But the informant
wasn't able to set up a meeting with AL? 14. was he? 15. A. No.
16. Q. And then after he called AL, that's when he called Mo. 17.
right? 18. Correct. (the CI had to call an unidentified person to the
record name AL, who then gives the CI the Petitioner Number, for
reasons unknown, but we do know that the Petitioner was never the
receiver of the Uncharged cocaine. CI's recording device is proof of
such.) (quoting "I said Fuck it I'm gonna go right here. I gotta see some-
body right by here. I was gonna give them the Fucking car right now.)

2.

And corroborated information related to the alleged meeting, however, this is not true. On pg. 3 of 9, 2nd paragraph of this same memorandum, the Judge states, "the meeting of the cooperating defendant and defendant Mo occurred in substantially the manner the cooperating said it would, where he said it would occur, at the time he said it would occur and Mo was driving the make, color and type of automobile the cooperating defendant said or predicted." See Supp. Tr. pg 6, 7-12

7. A. No. The cooperator was going to — was supposed to meet
8. Mr. Cherry at a residence at 147th and Loomis — I believe
9. that's Markham — And to do it at that residence would be out
10. of our control and it would be dangerous for all parties
11. involved. So we moved the location to 159th Street and Kedzie
12. in Markham in a strip mall.

According to these records, the Judge's statement mentioned above is incorrect seeing as the record doesn't actually reveal anything the cooperating witness said and the court didn't allow Mr. Cherry to face his accuser, which is also a violation to his 6th Amendment constitutional right. Next, Agent Brazao spoke on behalf of the informant's allegations, yet, there's no testimony to validate that a meeting or time of a meeting would even take place. The informant's alleged location of the "meeting" was never

3. Duly note: Informant never testified to anything. Petitioner was deprived of his 6th Amendment Constitutional Right, to face his accuser. A clear Crawford v. Washington violation.

3.

corroborated and there is no testimony from law enforcement that mentions the informant's "predictions" regarding the meeting or arrest of Mr. Cherry. This scenario is a fictional representation of the agent's version of what transpired and by not corroborating the existence of a meeting, agents instructed the informant to lure "Mo", "Big Al", and whoever else he could convince to meet him at the location of 159th and Kedzie. Therefore, the testimony of the agents are contradictive to the Judge's opinion, which is, according to the law, expected to be based on the records.

According to the memorandum mentioned above, the court states, "The officers also knew from their own observation that just prior to the arrest signal, defendant was seen to position himself in such a way as to allow him to look into the back of the cooperating defendant's automobile in a manner that would enable him to view the contents of the narcotic trap (Supp. Tr. pg. 76, 87-88, 91). Upon hearing the police, defendant attempted to run into his car and escape before the police could arrest him, evidencing knowledge of guilt. These facts taken together are sufficient to establish probable cause to arrest the defendant." This is a fabricated statement by Officer O'Reilly. See Supp. Tr. pg 12, 5-19

5. A. In a short time, maybe three minutes, if that, I observed
6. the cooperating defendant get out of the driver's side of the
7. vehicle, which was the understood prearranged arrest signal.
8. So at that point, I called on the radio that it was an arrest,

4.

9. And agents moved in to arrest Mr. Cherry. At that point I was

10. focusing on the cooperating defendant - he was my

11. responsibility - and other agents were going to arrest

12. Mr. Cherry.

13. Q. Now, can you describe for the court how far apart the

14. defendant's car was from the cooperator's car?

15. A. A couple of feet.

16. Q. And when you - you said you were - your responsibility

17. was the cooperating defendant, what did you do?

18. A. Once I - I pulled up to the vehicle. I saw Mr. Cherry

19. getting out in my peripheral vision.

According to these statements made by Agent Brazao, Mr. Cherry was seen exiting the vehicle after the informant gave the arrest signal, after he radioed to the other officers that the arrest signal had been given and to move in to arrest, and only after he pulled up to the CI's and defendant's vehicle. This information is vital to the probable cause determination and if it goes unnoticed, it allows a grave miscarriage of justice seeing as to how the separation of the chaff from the wheat is crucial in determining the fabrications of the officer's testimony.

4. Agent Brazao stated in his investigation report, that he was ONE of the officers who arrested Petitioner. Now his testimony is opposite to what he wrote under penalty of perjury. Evidence of a officer submitting "False Statements", reckless disregard for the truth. Violation of Petitioner Due process - 5th Amendment.

5.

Petitioner instructed his attorney, Ms. Andrea E. Gambino, to obtain an enhanced version of the informant's recording device. This NEW EVIDENCE was noted by the court in the memorandum opinion and order [92] dated 5/16/15, pg. 3 of 4 First paragraph states, "The NEW EVIDENCE seems to corroborate that defendant got out of the cooperating individual's automobile and was immediately confronted by sirens and officers shouting at him". When analyzing the enhanced version of this recording in its entirety, the court will hear that there was no agreement of prearranged meeting, no agreement to accept or deliver any drugs and more importantly, the court will hear the cooperating defendant's door opening, followed by the sound of sirens, followed by the sound of a second door opening, which logically can only be the sound of Mr. Cherry exiting the vehicle to officers screaming, "Don't move!"

The court stresses that it makes decisions based on the "totality of the circumstances". Therefore, if we impartially assess the different version of events, we will clearly see that there is inconsistent information presented by the officers, The lead agent Brazao, whose main function was to alert all other officers once the arrest signal was given. The information he provided was inconsistent with what was provided by Officer O'Reilly. Brazao reported that he observed the informant step out of the vehicle, which was the arrest signal, he radioed to everyone to move in to arrest and he then drove up to the rear of the

6.

informant's and Mr. Cherry's vehicles. See Supp Tr. pg 12, 19

19. getting out in his peripheral vision.

See Supp. Tr. pg. 193 6-7

6. I was one of the first cars up to the Mercedes and the
7. Jetta.

On the contrary, O'Reilly testified that Mr. Cherry was outside of the vehicle, looking in the back area of the cooperating defendant's vehicle, where the trap was located and upon hearing sirens, Mr. Cherry turned around to see officers approaching and then began running to his vehicle. According to these different account of events, it appears that someone, if not both, is being untruthful. It is impossible for these two different versions of events to have taken place at the same time. See Contreras, 820 F.3d at 364 (citing Freeman 691 F.3d at 900 and United States v. Taylor, 701 F.3d 1166, 1174 (7th Cir. 2012)), "To find a witness's testimony to be incredible as a matter of law, it must have been physically impossible for the witness to have observed that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all." It's impossible for Brazao to have seen, from his peripheral view, Mr. Cherry exiting the vehicle once Brazao pulled up - as well as - O'Reilly witnessing Mr. Cherry positioning himself in a way to look in the back of the cooperator's vehicle. Only one version of events can be accurate and the other version would appear to be fabricated.

The last version of events to be taken into consideration

7.

are based off of the informant's recording device. After listening to the recording, undisputedly, the government shall concede, and the court shall reconsider and reverse the conviction as a matter of law because this recording depicts the actual events that occurred on May 31, 2012, which includes the informant lying about the drug transaction seeing as the 13 kilograms were actually intended for someone else. it also [5.] confirms that the informant exited the vehicle, followed by sirens, which is then followed by the sound of another car door opening, presumed to be Mr. Cherry exiting the vehicle and immediately being confronted by officers screaming, "Don't move"! This tangible evidence corroborates Agent Brazao's testimony (Supp. Tr. pg. 12, 5-19) and the court must not forget that it has already made the determination that per the memorandum opinion and order [92] dated 5/6/15, pg 3 of 4 first paragraph, "The new evidence seems to corroborate that defendant got out of the cooperating individual's automobile and was immediately confronted by sirens and officer's shouting at him."

Despite the motives of Brazao, O'Reilly, the informant or Mr. Cherry, the recording has no motives and presents things as they are. Once again, when taking all of this into consideration, "the totality of the circumstances", the court as a matter of law, shall deem O'Reilly's testimony as incredible. O'Reilly

5. See Exhibit C - The transcribe of the informant recording device. "I said fuck it I'm gonna go right here, I gotta see somebody right by here, I was gonna give them the fucking car right now".

intentionally and strategically fabricated the details of Mr. Cherry's arrest, which denied him his right to due process and denied his constitutional right to a fair trial.

## SUPPORTING CASE LAW

William D. Avery v. City of Milwaukee, et al; 847 F.3d 433; 2017 U.S. App. LEXIS 1651 No. 15-3175 states, "A police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of his liberty in some way. Falsified evidence will never help a jury perform its essential truth seeking function. That is why convictions premised on deliberately falsified evidence will always violate the defendant's right to due process. What's relevant is not the label on the claim, but whether the officer's created evidence that they knew to be false."

Ricciuti v. N.Y.C Transit Authority, 124 F.3d 123 (2d. Cir 1997) states that "No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee."

U.S.A. v. Herbert Orr 489 F.2d 872; 1973 U.S. App LEXIS 6671 No. 73-1251 (7ᵗʰ Cir.) states, "Almost four decades ago a unanimous Supreme Court held that "The rudimentary demands of justice" were violated by a "deliberate deception

OF Court, and jury by the presentation of testimony Known to be prejured".

## Conclusion

The Record is Clear, Counsel(s) performance was deficient for failing to heed Petitioner's instruction to direct the Court's Attention to the Erroneous interpretation of the record. Therefore, it's either by design or error that this Court chose to interpret the record incorrectly. In either event, The Petitioner has been deprived of liberty, due process of Law, due to these egregiously Opinions, which Appears to be bias. An independant and honorable judiciary is indispensible to justice in our society, Wherefore, the Petitioner Asks the Court to uphold the integrity of the judicial process, correct the wrongs of bad judgement, and place an order to cease this Act of the government, whose sole purpose seemingly has been to deny Mr. Cherry the protection of his Constitutional Rights. If the Court chooses to ignore or disregard the evidence presented by the recording device, then the court would be deliberately disregarding Mr. Cherry's constitutional rights and initiating a grave miscarriage of Justice. The appropriate proposed solution in this matter is to dismiss all charges or in the Alternative, reverse the convictions.

Counsel was Constitutionally Ineffective
For Failure to have A trial Strategy

During the Petitioner's trial, he asked Counsel
"What was the trial strategy?" Counsel replied, "That
she didn't have one". The Petitioner's wife Angela Timms
was present during this conversation. (I declare under penalty
and perjury) At that moment, Petitioner believes Ms.
Andrea' E. Gambino was compromise by the government,
For the Following reasons:

1. Counsel was a person of Interest into a Federal investigation
2. Counsel and Petitioner never spoke of a trial strategy
3. Counsel did not File an Affidavit alleging what the true Facts
   are See Tr.Tr. pg 6, 14-17. (The Court Scolds Counsel)
14. IF you're challenging the Facts, IF
15. your client is saying he did not ask to cooperate, then you
16. should have Filed an Affidavit with these Facts. You Know
17. that. (I Declare under the penalty of perjury - Petitioner
   never asked to cooperate)
4. Counsel disregarded Petitioner specfic instructions to
   Accept Juror French. During the lunch break Petitioner
   instructed Counsel to ask Juror French, "what did he say he
   like to read? And if he answered the Bible, to accept him
   as a juror. See Tr.Tr. pg 92 5-8.
5. Mr. French, I didn't catch what you said you like
6. to read

7. Prospective Juror French: what I said, I said -- I
8. think I said I read the bible daily.

Clearly Counsel followed Petitioner's instructions as to the question, but failed to accept the juror as Petitioner instructed. See Tr. Tr. pg 96.

5. Counsel failure to file a timely Corely violation

6. Counsel failure to obtain O'Reilly alleged notes, or file a Brady violation for withholding exculpatory evidence, if these notes don't exist or haven't been made part of the discovery and available Counsel, proves O'Reilly presented false testimony to the Court and jury, and the government knows this to be fabrication, and if the government claimed not to know, as a matter of law, they should have known.

7. Counsel expressed that she did not want to put Ofc. Gamboa on stand (= declare under penalty and perjury) Petitioner insisted she comply with his wishes. During Pretrial meetings (Due to lack of discovery- Petitioner is unable to point to record) However, Court should remember Petitioner was not present at the start of the proceeding's, but when Petitioner arrived the Court acknowledge Petitioner's presence, this is when Petitioner realized that Counsel was not going to call Ofc. Gamboa to trial, Counsel knew that Petitioner wanted to show that O'Reilly was fabricating the details of the arrest, the fleeing

1. Petitioner spoke with Ms. Meredith Clifton in preparation of the PSR, she asked why did you go to trial, Petitioner stated to show the judge I wasn't lying at the suppression hearing.

2

theory, positioning to be looking at the trap compartment, the reading of Petitioner's Miranda rights, the willingness to cooperate. Gamboa was the arresting officer and if testified truthfully would undermine O'Reilly's version of events. Petitioner had to reiterate to Counsel the importance of having all officers present at trial, who was present at the arrest scene. Counsel then requested Gamboa to be present at trial, in all FAIRNESS, Gamboa should have been the government Star witness – he's the arresting officer, instead, Gamboa is forced to be a witness for the defense, and the fact Counsel did not want to question Gamboa, is proof that Counsel did not thoroughly prepare to ask the pertinent questions necessary to vindicate Petitioner and/or raise doubts in the minds of the jury as to the allege facts of the government case. Thus proving that Counsel performance fell below the reasonable standards set forth in <u>Strickland v. Washington</u>, <u>466 U.S. at 687, 104 S.Ct. at 2064.</u> COUNSEL WAS INEFFECTIVE

2. The crux to Petitioner case is Credibility-(Believable), when the Court can't find No-one who legally is believable, Accountability makes everything clear. Officers need to be held accountable for opening/closing of the Satchel, for re-arranging the contents of the Satchel, and ordering Castenada to photograph the evidence in the manner in which he did. Some one had to do this, the fact the gov. case/the record is devoid of Accountability, the gov. case should fall – as a matter of law – for failing to prove Due process of Law.

throughout Petitioner's entire proceedings.

8. Counsel failure to object to jury instruction #13. What was the Petitioner in trial for, if it wasn't to challenge the improper use of the informant, the recording device, the use of a personal camera, and the government attempted (illegal) act to deliver/ sell the Petitioner drugs? No trial strategy and Counsel refused to explore this instruction, which would have surely raised doubt in the minds of the jury, but with-drawing instruction #13 insures that the officer's illegal actions, disregard for department policies, Federal law, and Constitutional protection goes unchecked, renders the Petitioner an Unfair trial.

9. Counsel was notified by Petitioner that Agent O'Reilly was outside the Courtroom speaking to witness who have yet to testify, Counsel alerted the Court of such actions, but after the Court scold Counsel, (outside the presence of the jury) but made Counsel look doubtful and incompetent in front of jury, left Counsel unwilling to alert the Court of any other misconduct of Agent O'Reilly, for instance, moving the evidence in-and-out the courtroom. Why was a witness handling the evidence? (I Declare under penalty and perjury) Even if we can't determine what O'Reilly intentions were for

3. This outrageous government misconduct should be duly noted, without any Corroboration of the informant's allegations, should Law Enforcement Act as the drug supplier, Law Enforcement actions displays a violation of Petitioner's due Process of Law at Best. It's the wholesale disregard to adhere to Constitutional provisions.

4

moving the evidence back and forth out of the courtroom, or the details of the conversation he was having with witnesses who has yet to testify. The Court has to agree that the appearance looks evil / inappropriate. If we reference the Probable Cause determination, the Court says because the defendant was willing to meet the informant, regardless to the scant information provided, the lack of police corroboration of Criminal activity as it particularized to the Petitioner, the lack of the informant's reliability, and the officer's statement as to why he believe the informant, as is required by law, or the lack of knowledge of the details of the conversation between the informant and the Petitioner, the Court ruled that officer's had probable Cause to arrest - which the Petitioner strongly disagree with the court, but what's sauce for the goose, has to be sauce for the gander, therefore, the fact that this court had admonished Agent O'Reilly not to discuss this case with other witnesses. See Tr. Tr. pg 286 18-19 After that warning O'Reilly is seen to be doing just that, it's the probability that he's discussing the case, trying to help prep witnesses what to say, and what questions to expect, The same probability that denied the Petitioner the protections of the Constitution in the court opinion dated April 11, 2013, should be that same probability that cease the illegal actions of Agent O'Reilly. Counsel was ineffective for failure to object O'Reilly sitting at the prosecution table prior to him testifying, this tactic allows the prosecution star witness the opportunity to see where the defense will be and the direction it's headed-in, making

5.

Scales of Justice unbalance/unfair. By the Court simply asking O'Reilly, Did he talk to the witness about the case? And O'Reilly replied No, is not sufficient to say that the court believe O'Reilly did not violate an order, the impartial and appropriate way would have been to summons the witnesses one-by-one and simply ask what was the details of the conversation they was having outside in the hallway with Agent O'Reilly? And if each witness testimony did not line up with one another, then the court could have concluded that a violation was in the mist, and that a mistrial had occurred.

6.

Trial and Appellate Counsel was
Constitutionally INEFFECTIVE For Failing
To object At Sentencing and Failing To Raise
On Appeal that Possession of a Machinegun,
IN 2017, IS NOT A "Crime of Violence" For
Purposes of U.S.S.G § 4B1.2 (a) (2), and § 851
Enhancement.

The Petitioner's previous home was raided while he was
not there and the CPD seized a Machinegun. IN state court
Petitioner was charged with Possession of drugs and
Possession of a Machinegun, however, as a result of a
guilty plea, the State of Illinois dropped / dismissed the
drug charge and Petitioner pled guilty to Possession of a
machine.

IN 2017, as a result of the Possession of a Machine gun
prior conviction and another crime of violence, a crime Petitioner
categorically and vociferously still contends he is innocent of,
the Court sentenced Petitioner as a Career Offender under
U.S.S.G § 4B1.1 and § 851 enhancement. Petitioner Guide-
lines range was 360-Life (Base offense Level 37), but the
Court varied and imposed a 240-month term on September
13, 2017.

Petitioner avers that, in light of U.S. v. Rollins, 836 F.3d
731 (7th Cir. Aug. 16, 2016), trial counsel was Constitutionally

- 1 -

Ineffective under <u>Strickland v. Washington</u>, 466 U.S. at 687-88, 694 (1984), For Failing to object to the imposition of § 4B1.1 and § 851 Enhancement because Possession of a Machinegun is <u>NOT</u> a crime of violence, and the Petitioner was never sentenced under any drug charge.

The Court in Rollins, 836 F.3d at 741-42, a case that was decided some 12-months and Fifteen days (15), held, and is applicable to the Facts and circumstances of the instant case,

> The residual clause is unconstitutionally vague and <u>Rollins</u> conviction for possession of a sawed-off shotgun is not a crime of violence under any other part of the definition in § 4B1.2(a). That is, it doesn't qualify under the "elements" clause in subsection (1), and it's not one of the specific crimes listed in subsection (2). ... But the note has no legal force standing alone. It follows, then, that because the residual clause in § 4B1.2(a)(2) is unconstitutional, the Application note's list of qualifying crimes is inoperable and can not be the basis for applying the career-offender enhancement. <u>Id</u>

Accordingly, like the sawed-off shotgun that is NOT listed under the "element" clause, § 4B1.2(a) and doesn't qualify under the elements clause and is NOT one of the specific crimes listed in subsection (2), the same holds true as to Possession of a Machinegun. Thus, the Application note's list of qualifying

crimes, such as a Machinegun, is inoperable and cannot be the basis for applying the § 4B1.1 enhancement for Possession of a Machine-gun. Rollins, 836 F.3d at 742

The Rollins case, which was an En Banc decision, was a well known case, and counsel is expected to know the laws applicable to Petitioner's defense, see Julian, 495 F.3d at 491, there is no excuse for counsel not objecting to the possession of a Machine gun as a crime of violence for purposes of applying the 4B1.1 and 851 enhancements, Enhancements that resulted in a sentence that is almost three-fold of the Guidelines range absent the § 4B1.1 and § 851 enhancements. That is, a Guideline range of 77-to-96 months (Base Offense Level 24, Criminal History Category IV). This egregious error not only constitutes deficient performance under Strickland, 466 U.S. at 687-88, but also a prejudicial error because of the actual additional prison time that resulted as a result of counsel(s) error. See U.S. v. Pennington, 667 F.3d 953, 957 (7th Cir. 2011) (quoting Glover v. United States, 531 U.S. 198, 203 (2003)) ("Authority does not suggest that a minimum amount of additional jail time in prison cannot constitute prejudice. Quite to the contrary, our jurisprudence suggests that any amount of actual jail time has Sixth Amendment significance").

In light of the above, the Court should vacate Petitioner's sentence, § 2255 (A)-(b), and resentence him without the § 4B1.1 and § 851 enhancements to a sentence of 77 months, 3 years Supervised Release, and due to the additional time

Petitioner had to spend incarcerated, Petitioner respectfully ask for fairness within the judicial process to terminate Supervised Release.

## Appellate Counsel was Constitutionally Ineffective For Failing to Raise the "Dead Bang Winner" Rollins supra, Issue on Appeal

The Petitioner avers that Appellate Counsel was Constitutionally ineffective under Gray v. Green (7th Cir.) and U.S. v. Cook, 45 F.3d (10th Cir. 1993), For Failing to raise the "dead bang winner" Rollins issue on appeal, an issue that there is a reasonable probability would have resulted in a reversal.

The Rollins issue was a nonfrivolous issue, a very strong issue, and would or should have jumped out while reading the sentencing transcript. Banks v. Reynolds 55 F.3d

The Court, in accord with 28 U.S.C. § 2255 (b), should also grant an evidentiary hearing as to the above Meritorious IAAC claim.

In the alternative, the government attempts to argue that Petitioner was convicted under a different statute for the drug charge. See United States v. Ruth (20-1034 7th Cir. July 20, 2020) Also, U.S. v. De LaTorre, 2019 U.S. App. LEXIS 3303 (7th Cir. Oct 10, 2019), prior under 720 ILCS 570/402(c) is categorically broader than the federal definition of a felony drug offense.

Therefore, Either way you look at the charge, Petitioner prior is <u>NOT</u> a predicate case For Enhancement purposes.
"DEAD BANG WINNER".

The government violated the Petitioner's Fifth Amendment constitutional right by denying Petitioner's Due Process of Law when testimony was presented that the government knew to be deliberately False.

Counsel(s)[1] was Constitutionally Ineffective For Failing to Follow Petitioner's express instructions to File a motion pointing out to the Court, Fabrication that was presented in the Record. Counsel(s) Failed to protect the Petitioner Right to a Fair trial, and a reasonable and sound decision. IF Counsel(s) would have Filed such motion pointing out the specific Fabrication presented by the government, the Court would have been properly informed, and in a better position to render a just, and accurate opinion that coincides with ruling precedents, Wong Sun v. United States (1963) 371 U.S. 471, 9 L.Ed. 2d 441, 83 S.Ct 407. Beck v. Ohio (1964) 379, U.S. 89, 13 L.Ed. 2d 142, 85 S.Ct 223. Recznik v. Lorain (1968) 393, U.S. 166, 21 L.Ed. 2d 317, 89 S.Ct 342. United States v. Cortez, 499 U.S. 411, 417-418, 66 L.Ed. 2d 621, 101 S.Ct 690 (1981), and it's undisputedly that a jury can never perform its essential truth-seeking Function where's Fabricated evidence has been presented.

i. Counsel(s) are Mr. Beau B. Brindley (Suppression hearing and Appellate Counsel) and Ms. Andrea E. Gambino (Trial Counsel)

1.

The Crux of Mr. Cherry's case is centered on credibility. Before a fact finder can determine the facts of a particular case, the parties involved must first present an undisturbed chain of events, present evidence as it occurred or in the manner it was discovered and provide truthful, unbiased, and malice free testimony. When a officer is found to have fabricated, manipulated, and/or provide deceitful details of an arrest, the court, if it goes undetected, becomes an accomplice to the officer's dishonorable actions and deprives Mr. Cherry the rudimentary demands of justice.

The Record reveals the inconsistencies of officer's testimony which included testimony of things that were physically impossible for the officer to have observed as well as the laws of nature making it impossible for certain alleged occurrences to have occurred. The following illustrates such discrepancies:

See Supp. Tr. pg. 76 (11-13) O'Reilly's testimony.

11. A. As Mr. Cherry got into the cooperator's vehicle, I slowly
12. backed my vehicle up and started moving towards their vehicle,
13. anticipating an arrest.[2]

See Tr. pg. 390 (2-4) Gamboa's testimony

2. Q. Okay. And after you saw that Mercedes come and park next
3. to the other car, did you guys move your spot?
4. A. not for a while.

2 Gamboa rode in the same vehicle with O'Reilly, who was not present during the Supp. hearing, but testified at trial as the defendant's witness. The gov. did not cross examine Gamboa, therefore, conceding to the contents of his testimony.

2.

Mr. Cherry provides this information for the sole purpose
of establishing the trend of inconsistencies in testimony. As
Mr. Cherry continues to dissect further, the revelations are
profoundly astonishing. See Supp. Tr. pg. 76 (13-23) O'Reilly's
testimony

13. Anticipating an arrest. I saw the door open up on the
14. driver's side of the cooperator's vehicle and I saw the
15. cooperating source stand up. At the same time, I saw
16. Mr. Cherry open his door. He stood up and he was looking in
17. the back area where the trap was located of the cooperating
18. vehicle - or cooperating defendant's vehicle.
19. At that point we were moving towards him slowly with
20. our lights off and everything. Special Agent Brazao told us
21. that the arrest signal was given. We moved in quicker at that
22. moment. I hit my lights and sirens. Mr. Cherry turned, saw us
23. and started running back towards his vehicle.

See Supp. Tr. pg. 72 (5-20) Brazao's testimony

5. A. In a short time, maybe three minutes, if that, I observed
6. the cooperating defendant get out of the driver's side of the
7. vehicle, which was the understood prearranged arrest signal
8. So at that point, I called on the radio that it was an arrest;
9. and agents moved in to arrest Mr. Cherry. At that point I was
10. focusing on the cooperating defendant - he was my
11. responsibility - and other agents were going to arrest
12. Mr. Cherry.
13. Q. Now, can you describe for the court how far apart the

3.

14. defendant's car was from the cooperator's car?

15. A. A couple of feet.

16. Q. And when you – you said you were – your responsibility

17. was the cooperating defendant. What did you do?

18. A. Once I–I pulled up to the vehicle. I saw Mr. Cherry

19. getting out in my peripheral vision. And I got out of my

20. vehicle.

Petitioner attempted to enhance the informant's recording device, not in an attempt to hear the contents of the conversation, but rather to hear the intricate details which would help expose the government's fabrication and illegal practices. The enhanced version would allow one to hear the informant exiting the vehicle by a car door opening, followed by sirens, then a second car door opens and an officer shouts, "Don't move"! See memorandum opinion and order 92, defendant's motion to reconsider pg. 3 of 4, the court writes, "The new evidence seems to corroborate that defendant got out of the cooperating individual's automobile and was immediately confronted by sirens and officers shouting at him". See Trial Tr. pg 390 (21-22) Gamboa's testimony:

21. A. Defendant Cherry upon seeing us exit, very quickly tried

22. to get into his vehicle.

When analyzing four different versions of the same event, one has to unbiasedly take note of the obvious inconsistencies. In the case at bar, we have a newly arrested, unreliable informant. This informant is on Federal probation and assisting law enforcement

4.

without the permission of the Court. Then you have the black guy who drives a white SUV type Mercedes and these two individuals are willing to meet for unknown/ uncorroborated reasons at a meeting place, 159th Kedzie, which was deliberately planned by DEA agents. These details will remain consistent no matter who tells the story, but the details surrounding what happened after the black male in the white SUV type Mercedes arrived until his arrest and departure by law enforcement, is questionable and under scrutiny. The details have to line up consistently with one another in order for a fact finder to determine what occurred or did not occur.

When reviewing Gamboa and Brazao's testimony, there are inconsistencies noted. Brazao, only after, the arrest signal had been given, after he radioed to move in for the arrest, and after he pulled up to the CI and defendant's vehicle, saw from his peripheral vision, Mr. Cherry getting out of the car. Gamboa states, "Defendant Cherry, upon seeing us exit." These two testimonies are consistent with each other and with the enhanced recording.

3. It's hard to ignore the systemic racism surrounding the information allegedly provided by the CI, which provoked the agents to conduct a full-scale reverse sting without video surveillance, a recording device equipped with a transmitter, without a gov. issued camera, without corroboration of this unknown black guy involved in criminal activity.

5.

On the contrary, O'Reilly is a lone ranger who testifies to thing's that has been contradicted and inconsistent to what other officer's has testified to have seen. Also, O'Reilly chain of events defy the laws of nature, making what he claims to have seen, impossible to have occurred. Such as:

1. The standing up, opening doors at the same time as the CS
2. Defendant prior to the arrest signal, was seen to position himself in such a way as to allow him to look into the back of the CS auto-mobile in a manner that would enable him to view the contents of the narcotics trap.
3. Upon hearing police sirens, Defendant attempted to run into his car and escape before the police could arrest him.

Clearly this is a Fabrication! The Court took this Fabricated evidence into consideration when it denied Mr. Cherry suppression hearing. See Memorandum Opinion and Order 2013 U.S. Dist. Lexis 54517 and Document # 198-1.

Moving Forward analyzing the record, See Supp. Tr. pg 78 (4-8) O'Reilly

4. A. I quickly looked inside the vehicle to make sure that
5. there was nobody else in the vehicle. As he was being
6. handcuffed, I stood over him, just to make sure nobody --
7. Again, that the vehicle was secured, no one else was in there
8. hiding. And I put Mr. Cherry inside my vehicle

Gamboa testifies to the same exact events See Supp. Tr. pg 395 (20-25)

20. And what did you do after you got him up off the

6.

21. ground.

22. A. We went to the rear of the vehicle.

23. Q. And what did you do there?

24. A. I just stood by him.

25. Q. And you stood by him for how long?

Gamboa continues Tr. Tr. pg 396 (1-5)

1. A. For a good period while the investigation continued

2. Q. So were you watching while people were searching the cars?

3. A. Excuse me?

4. Q. Did you watch a car search?

5. A. My primary focus was the defendant. I was watching him.

O'Reilly testifies to the same event, see Tr. Tr. pg 297 (15-17)

15. A. At that point, I picked up -- Gamboa and I both searched

16. Mr. Cherry to make sure there was no weapons on him -- None

17. were found -- and I placed him in my vehicle.

In view of this portion of the record we have O'Reilly testifying that after him and Gamboa arrested the defendant, he placed Mr. Cherry inside of his vehicle. Reading the record in it's entirety, O'Reilly goes on to testify, that at this time is when he reads Mr. Cherry his Miranda Rights, and at which time Mr. Cherry expressed a willingness to cooperate. Contrary to this elaborate story, Gamboa testified to arresting Mr. Cherry and immediately standing him up and placing him at the rear of the Mercedes, when asked for how long did he stand there with Mr. Cherry? Gamboa responded, "For a long period,

7.

Mr. Cherry was my primary focus.

In analyzing these two versions, somebody is lieing. It's either I'm in the front of the Mercedes being placed into O'Reilly vehicle, or I'm at the rear of the Mercedes with Gamboa. It is physically impossible when reviewing these two portions of the record for Mr. Cherry to be in two different places, in opposite direction at the same time.

Every officer who testified has stated when they pulled up, they observed the defendant at the rear of the Mercedes. See Crawford Supp. Tr. pg 53 (10-11)

10 After I got to the area, I observed Mr. Cherry on the
11. ground in the rear of the Mercedes, outside the car.

This testimony contradicts O'Reilly testimony See Supp Tr pg 91

10A. I just gave a brief look in there just to make sure that
11 there was nobody else in there with a weapon, just for officer
12 safety. I still had Mr. Cherry down below at my feet.

The driver's door is located towards the front of the vehicle. It is imperative to pay attention to this detail. If the petitioner is down at O'Reilly feet, and O'Reilly is taking a brief look through the vehicle as he testified, then how is it possible for Crawford to walk up to the driver side door and view anything? Did he step over the petitioner? Did he look over O'Reilly back and shoulder?

In analyzing MacDonald version of events See Tr. Tr. pg 260. 1525

15. Q. And what exactly did you see as you approached the
16. vehicle?

17. A. Well, I saw the front door. The driver's side door was

8.

7. open, so I approached that part of the vehicle and I saw a
8. briefcase in the passenger's side seat.

    Mac Donald continues Tr. Tr. pg 269 20-25

20. Q. And there were other agents also searching?
21. A. There were people in the vehicle searching, yes
22. Q. And who were those people?
23. A. I believe Dave Brazao was there, and I believe Special
24. Agent Crawford was there.
25. Q. Agent Brazao was searching the car before you got there?

    MacDonald continues Tr. Tr pg 270 1-5

1. A. Agent Brazao was at the car at the same time. Like I
2. said, I was searching the vehicle. I wasn't paying attention
3. to where anybody else was.
4. Q. And Agent Crawford also?
5. A. Agent Crawford was there at the car, yes.

    MacDonald continues Tr. Tr. pg 262 20-22

20. Q. But you were present from the very beginning of the
21. search.
22. A. Yes.

    Clearly these three officer's testimonies are not consisted, infact, the laws of nature make it impossible for either testimony to be factual. The Court erred on it's credibility determination. The MacDonald testimony just confirms the extent the government will go to present fabricated evidence, in the pursuit of a conviction, disregarding oaths, procedure's, policy, and Constitutional Rights. MacDonald, Crawford, and O'Reilly all can't be at the driver's door, nor can

9.

can MacDonald and Crawford be at the driver's door at the same time. It's physically impossible. Contreras, 820 F.3d at 364

Petitioner reminds the Court of his own decision making when dealing with the informant, the Court stated "that if the informant was right about the Make, Model, and Color of the defendant automobile, then he may also be right about other thing's such as the Fact that the defendant may be engaged in Criminal Activity". What is sauce for the goose, is sauce for the gander. The Petitioner has shown that the officer's have Fabricated the details of the Arrest, therefore, according to this court decision making, and Applying the equal protection of law, the Courts judgment, it is also plausible that the officer's Fabricated the plainview theory, manipulated the satchel, intentionally destroyed/withheld the camera/metadata which was exculpatory evidence, and the Elaborate story of Mr. Cherry desire to cooperate, and the Reading of his Miranda Rights the night of May 31st 2012, are all to be considered incredible. If the officers are shown to be Untruthful about one thing, then they are to be held Untruthful about everything else the Petitioner contest. The Court's credibility opinion resulted in a decision that was based on an unreasonable determination of the Facts in light of the evidence presented.

The government forfeits any argument to challenge Gamboa testimony, due to the Abandonment of their obligation to cross-examine Gamboa and correct any misstatements, inaccurate testimony, or misrepresentation. The government conceded, leaving Gamboa as the credible officer.

10.

The Supreme Court ruled in Mooney v. Holohan, 294 U.S. 103, 112, 79 L.Ed. 791, 55 S.Ct 340. This principle encompasses the prosecutor's Failure to correct False testimony, even though unsolicited and though it related only to the witness's own credibility. In the case before us, we must regard as deliberate the prosecutor's misstatement, his offer to produce inaccurate testimony, and his failure to correct his own misrepresentation. We need not decide whether such conduct violates the standards of Constitutional Due Process; Unquestionably, however, the principle underlying Berger and Mooney requires us to reverse this Federal conviction and remand for a new trial. Also, when an unequivocal material representation of this kind is made to the trial judge for the purpose of persuading him to make a ruling favorable to the government, the prosecutor is charge with the knowledge of his associates, whether the misstatement was a result of negligence or design, it is the responsibility of the Prosecutor.

The Seventh Circuit ruled in Contreras, 820 F.3d at 364 (citing Freeman, 691 F.3d at 900 and United States v. Taylor, 701 F.3d 1166, 1174) To find a witness's testimony to be incredible as a matter of Law, it must have been "physically impossible for the witness to have observed that which he claims occurred, or impossible under the laws of nature for the occurrance to have taken place at all".

The Petitioner reminds the court that "Credibility" is the Crux to Mr. Cherry case. Therefore, as a matter of Law, the Court has to deem O'Reilly and his fellow officer's as

incredible. No one is coming straight forward testifying truth-fully. See U.S. v. Ozuna 561 F.3d 728, 735-36 n. 3 (7th Cir. 2008) holding that reopening a suppression hearing may be appropriate when the proffered evidence calls the credibility of a witness into question.

See ATF Walsh and TFO Gamboa report of Investigation File #11-12-0172 pg 2 of 3 dated 06-12-2012 Line 5.

5. Cherry stated that he had no information regarding any unsolved murders or shootings, cherry denied any knowledge of any leaders of drug sale organizations. Cherry stated he did not know any street source of firearms.

This report was filed 12 days after Mr. Cherry arrest, the interview took place the next day after the arrest 6-1-12. 4. O'Reilly filed his report five months, twenty-six days from the arrest, ironicly, the day before Mr. Cherry Suppression hearing 11/26/2012 See Tr. Tr. pg 318 (16-25)

16. Q. Now, that report that counsel referred to on direct, you
17. said you filled it out or you wrote it about this conversation
18. months after this occurred, right?

19. A. Correct

20. Q. And, in fact, it was almost a half a year after this
21. occurred?

22. A. ~~It was a -- I~~ think five -- more than five months

4. Mr. Cherry was housed overnight at a Suburban jail, the following day Walsh and Gamboa transported Mr. Cherry to the DEA down-town office.

23. Q. It was November 26th of 2012?

24. A. Okay.

25. Q. The day before the last hearing on this case, isn't that
    O'Reilly continue Tr. Tr. pg 319 (1-22)

1. correct.

2. A. That's correct. That's when I found out that -- I found

3. out that there wasn't a report written by other people that --

4. Q. There's no question pending. Agent.

5. A. I'm answering the question you said.

6. Q. No. The question I asked you. --

7. A. All right.

8. Q. -- was it was 11/26/2012, the day before the hearing; isn't

9. that correct?

10. A. I don't remember your question now. I'm -- don't remember

11. what I was going to say.

12. Q. I'm asking you the question I asked you before, which

13. doesn't require an explanation

14. A. Well, can you repeat the question?

15. Q. Yes. The report that you wrote was prepared on November

16. 26th of 2012, the day before the last hearing in this case?

17. A. Yes, ma'am.

18. Q. Now, Agent, you were not on vacation from May of 2012 until

19. November of 2012, were you?

20. A. No ma'am

21. Q. Now, the fact of the matter is that Mr. Cherry did not

22. cooperate with you did he?

13.

The Petitioner would like to direct the Courts Attention to lines 2 and 3 of O'Reilly testimony Tr. Tr. pg 319. O'Reilly testified that he found out that there wasn't A report written by other people, but According to O'Reilly At Tr. Tr. pg. 299 (25)

25. Q. Agent O'Reilly, you testified earlier that you were inside

O'Reilly continues Tr. Tr. pg 300 1-13

1. of your vehicle, that you had backed up your car a little bit;

2. is that right?

3. A. I backed it up from -- Away from the scene, yes.

4. Q. Okay

5. A. I actually backed it up and moved it over towards Kedzie

6. Avenue to get Away from where the search was being conducted

7. Q. So when you backed up, other agents were searching the

8. Mercedes; is that right?

9. A. That's correct.

10. Q. And you -- who was in the car with you?

11. A. Just Mr. Cherry.

12. Q. So you and Mr. Cherry were in your car?

13. A. Right.

Based solely on the Record and applying common-sense. Who was suppose to write a report, if only Mr. Cherry And O'Reilly was in the vehicle? This is Fabrication. Gamboa testified that 'Mr. Cherry was his primary concern, he was watching the defendant As the other officer's were searching the vehicle." (Summarizing) see Tr. Tr. 396 1-5 compare that portion of the record to O'Reilly Tr. Tr pg 300 5-8.

14.

The laws of Nature makes it physcially impossible for either testimony to have occurred, but Since the government refused to cross-examine Gamboa, the government conceded to Gamboa as the credible witness, therefore, declaring O'Reilly testimony as incredible.

Clearly, O'Reilly testified in manner to deceive the court, hoping that he could persuade the Court and jury to rule in the government favor. The government understands that the case they presented against Mr. Cherry was/is lacking in several regards.

1. The string operation was illegal, - No evidence of illegal activity corroborated. Federal authorities did not have the permission from the State of Illinois or the City of Chicago to operate in such a capacity against Mr. Cherry - No court approval - A warrantless arrest is presumed Unreasonable

2. The arrest was illegal - No evidence of illegal activity corroborated or seen by law enforcement, Scant information provided by an Unreliable, Unauthorized Informant. Probable Cause lacking.

3. The Search of the Vehicle was illegal.

4. The Inevitable Discovery does not Apply

5. A Corely violation is present

6. A Brady violation is present.

7. A Fifth Amendment Constitutional Right is violated Due Process denied when the government presented fabricated Evidence

8. A Sixth Amendment Constitutional Right is violated.

15.

the Right to Face my Accuser - The informant. Officers testified at trial to what the informant Allegedly said, denying the Petitioner The opportunity to cross examine and impeach his testimony.

Where ever there is Fabrication, there will Always be A Foot print of the Truth. Petitioner prays that this Court Opinion And Order will Reflect the Record As pointed out herein this motion, and in a Adversary proceedings where there is conflicting testimonies, The Court has to declare someone As credible And the other As incredible. In the case of Mr. Cherry v. U.S where All the witness's Are Law Enforcement officer's, if one is deemed incredible, then As A matter of Law, A guilty verdict can never stand. A reversal demanded. Credibility is the crux to Mr. Cherry's case.

16.

Counsel(s) was Constitutionally Ineffective For Failure to effectively pursue, and secure the right to cross-examine the Petitioner's accuser, The Government violated Petitioner's Sixth Amendment Constitutional Right when they withheld the informant From being Cross-examination, but used the informant Alleged statements to Convict the Petitioner.

Trial Counsel was Constitutionally Ineffective For opening the door to Allow incriminating evidence before the jury that caused a conviction. See Tr. Tr pg 228:
MS. FERNANDEZ-HARVATH: At this time, your honor, I think that Counsel has sufficiently opened the door to bring in any-- All of the information that the agents had at the time that they-- before they got to the Surveillance. She talked about the fact there was an informant. She disclosed that there was an informant. He told them where to go. He told them where to go. He told them where to go and what to do based on the information that they had. She also stated that there was no Cocaine in the Jetta. See Tr. Tr. pg 231: THE COURT: Well, whatever the CI said to explain the relationship seem to me comes into evidence, since you've called that relationship into question. See Tr. Tr. pg 232 THE COURT: if you object to that, I overrule it, You brought out the fact that they turned this man into a confidential informant They have a right to explain how that happened.

1.

The Government made statements in their closing arguments which were prejudice to the Petitioner, and which also supports Petitioner's <u>Rovaric claim</u> - The need to cross examine the informant - Since the government entire case rest solely on the word of an unauthorized, unreliability - as a matter of law - informant. See Tr. Tr. pg 442, 5-11

5. The defendant DeAndre Cherry owed a debt to his drug
6. supplier. His drug supplier, the guy who he knew as Fat Guy
7. had fronted him half a kilogram of heroin, very valuable
8. heroin as you heard, on the condition that the defendant repay
9. him after he sold it. It was that arrangement, that fronting
10. of the heroin, that brought the defendant to that meeting with
11. his drug supplier on May 31st, 2012 in Markham

Prosecutor Ms. Biesenthal presented this fabricated evidence to the jury, which violates Mr. Cherry due process, but the issue with the government presentation, is that the statement is not in agreement with the government initial arguments, or the record. See Tr. Tr. pg 236 11-25

11. Q. When did you arrest that -- the informant that day?
12. A. It was approximately 11:00 in the morning
13. Q. And what was he arrested for?
14. A. We arrested him with 26 kilogram of cocaine

1. The informant told the Agents that he never gave the Petitioner any heroin. The government is withholding exculpatory evidence. The need to cross-examine the informant is "crucial" to the defense.

2.

15. Q. And after you arrested him with 26 kilograms of cocaine
16. did he agree to cooperate?
17. A. Yes.
18. Q. What -- what did the informant tell you that he was going
19. to do with the 26 kilos of cocaine
20. A. After picking up the cocaine, he was supposed to deliver
21. 13 kilograms to an individual he knew as Mo and another
22. individual not related to the case.
23. Q. And the -- did the defendant provide any other information
24. about Mo?
25. A. That he only knew as Mo. He's dealt with him in the
   continue Tr. Tr. pg 237 + 20
1. past. Black Male, drove a white Mercedes and said he's been
2. to his residence in the past to do other transactions. That's
3. how they met.
4. Q. And where was he expecting to deliver the -- or to deliver
5. the 13 kilograms to the defendant?
6. A. It was, according to the informant, it was prearranged
7. that he would meet him at Mo's residence at 147th and Loomis
8. I don't remember the correct address, but it was a house
9. Q. After you received this information, what did you do?
10. A. We formulated a plan.

2. Agent Brazao testified at the suppression hearing (supp Tr pgs 21-25)
   that they never corroborated the informant allegations at all. But
   yet Brazao is presenting this information to the jury as factual
   —The need to cross-examine the informant is crucial to the defense

3

Clearly this is a different version from what the prosecutor presented to the jury in their closing argument, and it should be duly noted that the government witness'es never testified to such, or made a report of anything resembling such. See Supp. Tr. pg 62 (17-25)

17. A. Basically because this was a reverse scenario, our
18. informant was in the role of being the provider of narcotics
19. and the defendant was supposed to be coming with money to
20. purchase narcotics.
21. It kind of surprise me that drugs -- that he was
22. bringing drugs to the scenerio Also, and that's when I was,
23. like, why do we have drugs here when the drugs were supposed
24. to be in the CI's vehicle and nothing had been taking out yet.
25. Q. So to be clear, what surprise you was that you were going

continue Supp. Tr. pg 63, (1-3)

1. To be delivering drugs to a potential defendant as opposed to
2. purchasing the drugs?
3. A. That's right

Agent Crawford testified that he was "surprised", due to the fact the informant never disclosed such information. The government is misrepresenting the informant, and this is why it's imperative for the Petitioner to cross-examine the informant, doing so, brings forth the Truth and Shines a light on the government fabricated and illegal/unethical practices.

4.

At the Petitioner's sentencing hearing the same Prosecutor Ms. Biesenthal sought to enhance Petitioner guideline range for obstruction of Justice, the prosecutor argued that Petitioner testified at the Suppression Hearing in an attempt to deceive the court, implying that Mr. Cherry was presenting Fabricated evidence to persuade the court to rule in favor of the Petitioner. Not only is this prejudice to Mr. Cherry. Wherefore, Mr. Cherry did not even testify at Trial, so for the gov. to use Cherry's Suppression hearing testimony, twist the wording, and present that information to the jury to advance their case is a "Foul blow".

The Prosecutor knew that the opening statement in their closing argument was Fabricated, The Prosecutor knew because of the information that the informant provided to the agents. The informant also told the agents that Mr. Cherry statement was false. The informant is a material witness to the distribution of heroin charge, not only is the owner said to be the owner of the heroin, but the informant is also allegedly said to be the receiptant of the charged heroin. Therefore, making the informant necessary — as a matter of law — to be crossed-examine by the defense to determine the truthfulness of Mr. Cherry statement or not, and to determine the real reason for calling Mr. Cherry to meet him that night, which very well may lead to more discrepancies and revelations into the gov. weak and illegal case against the Petitioner.

5.

The Petitioner should not be forced to spell out his defense to the Court, which causes Mr. Cherry to reveal his strategy to the gov. We see what will occur if and when done so. See Tr.Tr. pg 232 (23-25)

23. MS. FERNANDEZ-HARVATH: Your Honor, may we have just
24. a few minutes, because I have told this agent that he can't
25. answer any of these things, to tell him the areas that we're
continue Tr.Tr. pg 233 (1)
1. going to cover.

This is the Prosecutor admitting that she is tailoring the Agents testimony, basically telling the Agents, "I'm going to ask you these specific questions, and I expect for you to give me these specific answers. The defense will ask questions along these lines, and I expect for you to answer in this manner, and reframe from answering any of these questions." CLEARLY a violation of Petitioner's Constitutional Right to a Fair trial.

Law Enforcement Officer's in the present case has an obligation to seek out the Truth, and present that Truth as their evidence to the prosecutor and to the Court, when Law Enforcement Fail in their sworned obligation, they deprive the defendant his right to a Fail trial, also, the Right to "Due process of the Law".

Certain Rights are a MUST! According to the language of the Confrontation Clause set forth in Crawford v. Washington. In the case of U.S. v. CHERRY

6.

It's required that the Court and gov. conform with such rules as to Allow Mr. Cherry to cross-examine the informant, failure to do so, will result in a grave miscarriage of Justice, and allowing the gov. to use Alleged statements of the informant, without the defense having the opportunity to cross-examine the source, renders Mr. Cherry an unfair trial. Petitioner ask that the conviction be reverse and remanded for a New trial consisted with the Six Amendment

T.

Trial Judge improperly interjected himself, Assumed role of Prosecutor, violation of Petitioner's Right to a Fair Trial.

During Petitioner's jury trial, the defense was cross-examining the controversal witness "O'Reilly", the Prosecutor objected to a line of questioning, the Court sustained, the defense counsel asked for a side bar, and during this sidebar, the defense counsel asked "What is the basis for the objection?" The Court then interjected without allowing the Prosecutor, who was the adversary opponent that objected to the line of questioning, to explain why the government had objected. Instead the Court scolded the defense counsel, and after doing so, turns and asks the Prosecutor, "Was that your objection?" See Tr. Tr. pg 325.

The mere fact that the Court abandon his role of impartiality, and played the role of the Prosecutor, not only did it effect the defendant unfairly, but in the eyes of the jury, whose watching the exchange of the judge scolding the defense council, by all means left an impression on the jury that the defense Counsel was incompetent, and that the judge was one-sided. See United States v. Noel Spears 558 F.2d 1296, 1977 (7th Cir.) The trial judge "lost his cool" departed from the equanimity of spirit required of him, and

seriously prejudiced the defense.

2.

## AFFidavit

I have drafted this petition myself, I hereby declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct, such petition, and the declaration(s) submitted along with it, are tantamount to Affidavits. See. LaFuente V. United States, 617 F.3d 944, 946 7th Cir. 2010.

Deo Andre Cherry
(pursuant to 12 U.S.C § 1976)

1.

# EXPEDITE RULING

Petitioner ask this Honorable Court to Expedite it's ruling for two reasons: (1) Petitioner has served over the maximum required time that Congress intended for any individual to serve with similar criminal background, as well as, that which is required for the crime charged. Though Petitioner seeks to be fully vindicated of the charges, Ground four of this petition requires this Court to release Petitioner immediately without any further delay. If the Court needed additional time in considering Petitioner's other six grounds, by all means take the time to do so, but to allow Petitioner to sit in prison another day, would constitute cruel and unusual punishment, especially when it's "CLEAR" and "KNOWN" to the Court that the Petitioner has a "DEAD BANG WINNER". (2) Due to the compelling and extraordinary circumstances that our nation face today with the Corona virus (COVID-19) and the potential threat it face inmates in prison.

Petitioner falls into the category of obesity, those individuals (according to the CDC - Center of Disease Control-) are at greater risk to contract and be effected severely and suffer irreparable harm, possible death if exposed. Coupled with the fact Petitioner Mother has passed away from this deadly disease, who was a HUGE and extremely important

1.

Factor in providing and being a caretaker of Petitioner two youngest children. Petitioner wife is under a huge stress of trying to protect, educate, and provide for the children without potentially exposing the children to the virus, with Petitioner home, he can help with the daily operation of the restaurant, while the Mrs can attend to the children need, thus minimizing the potential threat of the family contracting the disease.

Petitioner prays that this Honorable Court takes this request to expedite his ruling into consideration.

2.

Exhibit A

# AFFIDAVIT OF TRUTH

I. Charges Based on Results of Illegal Search

A. No Probable Cause for Arrest: No Observation of Any Illegal Activity

    1. Info Provided by CI Not Corroborated
        a. location
        b. identity of person
        c. intent to accept delivery
        d. knowledge that drugs were in the car

    2. No Flight - Not corroborated by testimony or tape

B. Drugs Not in Plain View
    1. No Basis for Searching car
    2. Logical Interpretation of Photos supports Closed Bag First
    3. Agent Testimony by First to See Car - No Plain View
    4. Metedata Destroyed that would have provided Evidence

        Presumption against government based on Destruction of Evidence, Failure to turn over Bad Faith Evidenced by knowing that Photos taken in prep. for Litigation

II. AGENTS BELIEVED THAT CI GOING TO DELIVER DRUGS TO MO

    A. Belief WAS FALSE - CI Did Not tell the truth

    →Told Cherry he WAS delivering CAR TO SOMEONE ELSE

III. DEA AGENTS CAN NOT TESTIFY TRUTHFULLY ABOUT BACKGROUND WITHOUT including CI

    A. Ex Planation OF Why AGENTS WERE PRESENT WHERE THEY ARRESTED DC WAS BECAUSE INFORMANT CLAIMED HE WOULD BE THERE TO ACCEPT DELIVERY OF DRUGS

      1. Can't TRUTHFULLY Explain why They were there without CI

      2. ARRESTED AND RELEASED INFORMANT, FOLLOWED him to PARKING LOT

        NOT TRUE, MISSTATED FACTS - They told him to go to THE PARKING LOT

      3. "OBSERVED White SUV Circling The AREA IN SUSPICIOUS MANNER"

        misleading - circling because did not recognize or Know car that CI WAS IN

      4. "GET IN AND OUT OF CAR AND FLEE"

        Not consistent with tape.

      5. HEROIN NOT IN Plain VEIW IN CAR

IV. FACTS RELIED ON BY Court INCLUDE AGENTS RELIANCE ON CI's information BEING CORROBORATED - NOT ACCURATE ASSESSMENT AND IN OPPOSITION TO TAPE

2.

V. NO EVIDENCE TO SUPPORT FLIGHT, TESTIMONY OF AGENTS, PLACEMENT OF CARS, TAPE RECORDING — NO SUPPORT FOR BALD ASSERTION

VI. GOVERNMENT HAS IT BACKWARDS: NO PROBABLE CAUSE TO SEARCH CAR, PETITIONER ARRESTED BEFORE ANY (FABRICATED) PLAIN VIEW HAPPENED

THERE WAS NO PLAIN VIEW

ARREST DEPENDED ON WHAT AGENTS ASSUMED HAPPENED: ACCEPTANCE OF DRUGS IN CI CAR — BUT THEY JUMPED THE GUN — THERE WAS NO EVIDENCE OF ANY ATTEMPT TO ACCEPT THE CAR OR DRUGS — NO BASIS FOR ARREST - PROBABLE CAUSE LACKING

VII. METADATA: EXCULPATORY AND NO SUBSTITUTE FOR EVIDENCE OF ORDER IN WHICH PHOTOS TAKEN AND WHERE THEY WERE TAKEN

A. GOVERNMENT KNEW AT THE TIME OF THE SUPPRESSING HEARING THAT THE ORDER IN WHICH THE PHOTOS WERE TAKEN WOULD BE A ISSUE

IT WAS ASKED ABOUT BY SUPPRESSING HEARING COUNSEL, COUNSEL CALLED THE PHOTOGRAPHER TO TESTIFY, AND HE DID NOT REMEMBER, METADATA WOULD HAVE PROVIDED CONCLUSIVE EVIDENCE OF THE ORDER IN WHICH PHOTOS WERE TAKEN AND WHERE THEY WERE TAKEN

THIS WAS KNOWN OR SHOULD HAVE BEEN KNOWN TO

3.

THE GOVERNMENT AT THE TIME OF THE SUPPRESSING
HEARING

GOVERNMENT'S FAILURE TO CALL THE PHOTOGRAPHER
OR PURSUE THE EVIDENCE IT HAD IN IT'S POSSESSION WAS
SIGN OF BAD FAITH AT WORST AND OSTRICH BEHAVIOR AT
BEST— FAILING TO ENQUIRE, DESPITE REQUESTS FOR FEAR
OF LEARNING THE ANSWER.

B. THREE PART TEST MET

1. BAD FAITH IN KNOWING ISSUE AND DESTROYING
EVIDENCE (CAN'T PRESUME IGNORANCE OF CAMERA OF INFO)

2. WOULD HAVE BEEN APPARENT IF LOOKED

3. DEFENDANT TRIED TO GET INFO BY OTHER MEANS—
QUESTIONING THE PHOTOGRAPHER, BUT HIS MEMORY
FAILED— COULD HAVE CHECKED THE METADATA, KNEW HE
HAD IT, KNEW IT WAS AT ISSUE

— NOT LIKE STALLWORTH, BECAUSE HERE KNEW
OF EVIDENCE AND FAILED TO PRODUCE IT

4. DISPOSED OF CAMERA AFTER HEARING BUT
BEFORE TRIAL

I FAT GUY / INFORMANT
- NEVER USED HIM AS INFORMANT BEFORE
- NO IDEA WHETHER HE WAS TRUSTWORTHY OR NOT
- CAUGHT WITH A LARGE LOAD OF DRUGS
- TRYING TO WORK HIMSELF OUT OF TROUBLE
- HAD BEEN IN TROUBLE BEFORE

4.

- HAD AT LEAST ONE FEDERAL FELONY: LOOKING AT 10 OR 20 YEAR MANDATORY MIN. BASED ON AMOUNT OF DRUGS HE WAS CAUGHT WITH
- ON FEDERAL SUPERVISED RELEASE AT TIME OFFENSE
- DID NOT HAVE PERMISSION FROM THE COURT TO ACT AS INFORMER OR ASSIST LAW ENFORCEMENT- AS REQUIRED
- NO REAL NAME FOR MO
- DIDN'T CORROBORATE INFORMANT ALLEGATIONS OF CRIMINAL ACTIVITY- CONCERNING MO AT ALL.
- DIDN'T IDENTIFY HOUSE WHERE TRANSACTION WAS SUPPOSED TO HAPPEN
- INFO ABOUT 'MO' NOT VERIFIED:
  GANG MEMBER: denied
  MULTI-KILO DRUG DEALER: denied
  DRUG TRAFFICKING ORGANIZATION: NOT identified & denied.

II  SURVEILLANCE
  — NO VIDEO SURVEILLANCE
    did not record what you were observing, while observing it, NO ONE ELSE did either
  — AUDIO SURVEILLANCE limited
    device ONLY records, NO transmission
    DID NOT HEAR CONVERSATION
      NO WORDS ABOUT DRUGS
      NO WORDS ABOUT MONEY

5.

relied entirely on Information from Informant, and
relied entirely on Informant to follow instructions

   - DID NOT SEE A TRANSACTION

No exchange between INFORMANT/CHERRY

No ATTEMPT by MR. CHERRY TO TAKE ANYTHING OUT OF
CAR - Informant vehicle.

   NO ATTEMPT BY MR. CHERRY TO GIVE INFORMANT
ANYTHING

   - CAR DRIVES AROUND PARKING LOT - DOESN'T SEE
OR RECOGNIZE "FAT GUY" vehicle

## III  ARREST

   INFORMANT OUT OF CAR

   AGENT BRAZAO PULL UP BEHIND BOTH vehicles

   CHERRY exit INFORMANT CAR - IMMEDIATE ARRESTED

## IV  PHOTOS

· NO ACCOUNTAbility AS TO WHO ARRANGED the CONTENTS OF The
Satchel FOR The Photo Grapher

· NO ACCOUNTAbility AS TO WHO ARRANGED/OPEN/closed the
Satchel FOR The Photo Grapher

· CLOSED Satchel displays water (mottle) marks AS Agent
TESTIFIED TO, BUT OPEN Satchel displays NO water (mottle)
marks ON The CONTENTS protruding from the Satchel.
PROOF that Photos were NOT TAKING AT SCENE OR WAS IN
PLAINVIEW, it was raining hard the Night INCIDENT occurred

6.

RAIN would be visible in every photo if it happened as
officers testified
- CAMERA USED WAS NOT DEA EQUIPMENT/ NOT POLICE
EQUIPMENT

V. SUPPOSED TRANSACTION:
NOT WHAT EXPECTED
INFORMANT LIED

VI. RETURNED PROPERTY
CAR - NO INVENTORY. NO IMPOUNDMENT, Vehicle
WAS IN NO WAY Secured.
Satchel - Giving TO ATTORNEY SUSAN Shatz

VII. MIRANDA Rights
O'Reilly lied. Fabricated ENTIRE STORY
I WAS with Ofc. Gamboa standing in the RAIN
DID NOT GET READ MIRANDA RIGHTS UNTIL JUNE 1, 2012
NEVER STATED A Willingness TO COOPERATE
Walsh AND Gamboa investigation Report reads:
5. CHERRY STATED THAT THE had NO INFORMATION Regarding
ANY UNSOLVED murders or shootings, CHERRY DENIED ANY
KNOWLEDGE OF ANY leaders OF drug sale organizations,
CHERRY STATED HE did NOT KNOW ANY street source OF
FireArms

7.

I hereby declare (or certify, verify, or state) under the penalty of perjury that the foregoing Affidavit of Truth is true and correct, and I would like this court to construe all Exhibits / Affidavits as potential Arguments / Grounds that may raise valid Constitutional claims or a manifest error of law, and apply the necessary relief that's required by law.

Do Andre Cherry

8.

Exhibit B

# O'Reilly Impeached

Tr.Tr pg 296
2-3

I started driving slowly towards the with my lights out
(Gamboa testimony is in direct conflict)

Tr.Tr. pg 390
3-4

Did you guys move your spot? Not for a while

Tr.Tr. pg 296
6-17

moments later, Mr. Cherry was also opening his door, & stood up & he was turned around to look inside the back of the Volkswagen.
(Gamboa testimony is in direct conflict)

Tr.Tr. 390
21-22

Defendant Cherry upon seeing us exit, very quickly tried to get into his vehicle
(Brazao testimony is in direct conflict w/ O'Reilly)

Supp. Tr.
pg 12
18-19

Once I--I pulled up to the vehicle, I saw Mr. Cherry getting out in my peripheral vision.
(informant's recording device is in direct conflict)

See Judge
Memorandum
Opinion &
Order [92]
pg 3

"The new evidence seems to corroborate that Defendant got out of the cooperating individual's automobile and was immediately confronted by sirens and officer's shouting at him, "Don't move. Don't move".
On the tape you can hear when the CI opens the car door, next you hear sirens, then you hear a second car door opens, & then you hear officer's yelling.

1.

O'Reilly Impeached

Tr.Tr. pg 297
13-17
At that point, I picked up -- Gamboa and I both searched Mr. Cherry to make sure there was no weapons on him -- none were found -- and I placed him in my vehicle.

(Gamboa testimony is in direct Conflict)

Tr.Tr. pg 395
And what did you do after you got him up off the ground, we went to the rear of the vehicle, & what did you do there? I just stood by him, & you stood by him for how long? For a good period while the investigation continued.

(Crawford testimony is in direct Conflict w/ O'Reilly)

Supp. Tr. pg 53
10-12
After I got into the area, I observed Mr. Cherry on the ground in the rear of the Mercedes, outside the car, being handcuffed by several agents.

(MacDonald testimony is in direct Conflict w/ O'Reilly)

Tr.Tr. pg 260
17-25 &
continue on
pg 261, 1.
Well, I saw the front door. The driver's side door was open, so I approached that part of the vehicle, & I saw a briefcase in the passenger side seat. Q. Okay. And I'll get to the briefcase in a second, but when you walked up, did you actually see Mr. Cherry being placed under arrest? A. Yes. He was being arrested yes. Q. And what did you see happening at that time? A. I just heard he was -- he was being given instructions & he was being handcuffed.

NOTE: O'Reilly testified that he had me down below at his feet while he looked through the car, So basically I'm on the ground right outside my driver's side door, so it's impossible for someone to look inside the driver's side door as I'm being arrested, for we'll be blocking the path. Also, according to O'Reilly, after

2.

# O'Reilly Impeached

he looks inside the vehicle, he places me inside his car And we drives Away from the search. Then why is Crawford & MacDonald testifying that they were Able to look in the driver's side Door, but Also see Mr. Cherry being Arrested? Gamboa said that he stood me up & placed me At the rear of the vehicle see Tr. Tr. pg 396.5. "My primary Focus was the defendant. I was watching him." So if Gamboa primary Focus was me, then how am I with O'Reilly being read my Miranda rights & talking about cooperating? Who I'm with? Remember the government did not cross examine Gamboa, so they conceded-agreeing to everything he testified too.

Tr. Tr. pg 311    No one was yelling, "Stop," or whatever -- you made up earlier.

SEE Judge    (well the Informant Recording Device is in direct Conflict)
Memorandum    Officer's yelling don't Move
Opinion & Order    NOTE: O'Reilly being combative with the defense Attorney,
(92) pg 3    telling the jury that she made that up, but my lawyer didn't present this evidence At trial - proof she was ineffective

Tr. Tr. pg 324    Agent O'Reilly, with respect to this conversation that supposedly
1-16    happened in your car with Mr. Cherry, did you record it in any
Tr. Tr. pg 326    way? A. No. I did not (Again was Asked) And you didn't take
any steps to record that statements in any way, did you?
A. No, I did not. Q. Agent O'Reilly, you didn't use any Kind
of recording device on that conversation, did you? A. No

3.

# O'Reilly Impeached

Now that's two times he was asked in any way did he record it, and after five objections by the government and a side bar where the Judge plays Prosecutor, O'Reilly comes into conflict with his own testimony.

TR.TR. pg 326
14-16

A. I took notes that night, but I did write a report
Q until November of 2012. A. Yes, ma'am.

He just switched his testimony before the Court and jury. The problem with a lie, is that you create more problems. Now the Defense never received these notes in the discovery or before trial. — Brady violation —

4.

Exhibit C

(Phone rings.)

**CS:** I'm here. I seen you pass by. I'm in the itty bitty car. Yeah, I see you. You're right behind me. Yeah, you're right behind me. Yes sir.

**CS:** 'Sup my brother? You wanna hop in? Or you want me to...

(Unintelligible)

**CS:** Huh?

**DeAndre Cherry:** You're acting too fucking weird.

**CS:** Man, I went over there. Ain't nothing over there. All there were was these fucking cars and they all had tinted windows and they were all brand new with no plates and shit.

(Unintelligible)

**CS:** Huh?

**DeAndre Cherry:** Where at?

**CS:** Right on 147th. Right by Loomis and shit. I was like 'What the fuck?'. So I drove and I came around and I was like 'What the fuck?' and the boy didn't wanna drive his car so I had to fucking drive it.

(Muffled voice)

**CS:** I don't like driving with this shit bro.

**DeAndre Cherry:** You got it right now?

**CS:** Huh?

**DeAndre Cherry:** You got it right now?

**CS:** Yeah.

(Unintelligible)

**CS:** Huh?

(Unintelligible)

**CS:** I just came over here. I was like fuck this, I wanna go over here. I was just driving around

and I said fuck it I'm gonna go right here. I gotta see somebody right by here. I was gonna give them the fucking car right now.

**DeAndre Cherry:**     Oh, ok.

**CS:**     I've been here before.

(Unintelligible conversation)

(Police sirens)

## CERTIFICATE OF SERVICE

I certify that I have placed a copy of this Motion to Vacate, Correct or Set Aside Sentence pursuant to 28 U.S.C § 2255 in the Legal Mail here at FCI Pekin, for delivery to the United States District Court For the Northern District of Illinois, Eastern Division 219. S. Dearborn Chicago, Illinois 60604 in a sealed Envelope with postage pre-paid, on this 7ᵗʰ day of August, 2020

DeAndre Cherry

⇔42433-424⇔

Deandre Cherry
42433-424
Federal Correctional Institution
P.O.Box 5000
Pekin, IL 61555
United States

1.